FILED

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

03 JUN 25 PM 3:18

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

JUN 2 5 2003

| | | |
|---|---|---|
| ROY LOFTON, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV-02-H-476-S |
| JIM WALTER RESOURCES, INC., | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OF DECISION

The court has before it the April 30, 2003 motion of
defendant Jim Walter Resources, Inc. ("Jim Walter") for summary
judgment.  Pursuant to the court's May 1, 2003 order and May 27,
2003 extension, the motion was deemed submitted, without oral
argument, on June 19, 2003.

### I. Procedural History

Plaintiff Roy Lofton commenced this action on February 22,
2002 by filing a complaint in this court alleging violations of
42 U.S.C. § 1981.  Plaintiff contended that defendant's alleged
conduct constitutes (1) race discrimination and (2) retaliation.
Defendant's April 30, 2003 motion for summary judgment asserts
that plaintiff has failed to make a prima facie case of race
discrimination and/or retaliation and, in the alternative,
plaintiff has failed to rebut defendant's legitimate and
nondiscriminatory reasons for the conduct at issue; therefore,

defendant argues that it is entitled to summary judgment.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted evidence[1] in support of its own motion for summary judgment and filed a supporting brief on April 30, 2003.  On May 22, 2003, plaintiff filed evidence[2] in opposition to defendant's motion for summary judgment.  On June 19, 2003, plaintiff filed a brief in response to the defendant's motion for summary judgment.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000)  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or

---

[1] The defendant submitted the following evidence: (1) excerpts from the deposition of Ray Lofton with select exhibits; excerpts from the deposition of Rayford Kelley with select exhibits; (3) affidavit of Rayford Kelley; and (4) affidavit of Ronald Hill.

[2] The plaintiff submitted the following evidence: (1) deposition of Roy Lofton with exhibits; and (2) deposition of Rayford Kelley with exhibits.

filings which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only

3

meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-

4

moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[3]

Plaintiff, an African-American male, began working for  Jim Walter in 1977 "as a laborer, a track person."[4]  (Lofton Dep. at 20.)  Throughout his employment he held various other positions; the last job he had was as a rock duster.[5]  (See id. at 20-21.) Tommy Rutland, a white male, was plaintiff's immediate supervisor

_____

[3]  Facts are undisputed unless otherwise expressly noted. If the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 20 F.3d at 1115.

[4]  Plaintiff explained that in his first job with defendant he "installed the first track laid at Jim Walter, the first spike put down at Jim Walter on the surface."  (Lofton Dep. at 20.)

[5]  A rock duster is used to suppress conditions that can ignite fires in the mine.  (Kelley Aff. ¶ 7.)  This is accomplished by "spraying ground up rock dust in the mine" because rock dust is heavier than coal dust, thus preventing the ignitable coal dust from spreading in the mine.  (Id.)

for this job.  (See id. at 21.)  Plaintiff also reported to
Ronnie Hill, an Africa-American male.  (See Kelley Dep. at 12.)
As a rock duster plaintiff worked with Clive Thornton, an
African-American male, Eddie Torean and Dwight Ford.  (See Lofton
Dep. at 60, 95.)  Plaintiff was a member of the United Mine
Workers of American ("UMWA") and subject to the terms of the
collective bargaining agreement between Jim Walter and the UMWA.
(See Kelley Aff. ¶ 9.)

Jim Walter mines and markets industrial-use coal.  It
operates three underground mines as well as other support
facilities in Tuscaloosa and Jefferson Counties.  (See id. ¶ 2.)
At each mine there are a group of salaried foreman who work
underground.[6]  (See id. ¶ 3.)  They supervise the union hourly-
rated employees.  (See id.)  Each section foreman reports to a
coordinator who reports to an area manager.  (See id. ¶ 4.)  The
area managers report directly tho the Mine Manager who is the
highest-ranking person at the mine.  (See id.)  Also at each mine
there is an Industrial Relations Supervisor[7] who is responsible
for all personnel and human resources issues.  (See id. ¶ 8.)

_____

[6] These foreman supervise many different jobs; some are
responsible for the supervision of mining where coal is actually
extracted while others supervise crews who perform various
support functions.  (See Kelley Aff. ¶ 3.)  The foreman are
typically referred to by informal titles that reflect their
specific job duties.  (See id. ¶ 5.)

[7] Rayford Kelley is the Industrial Relations Supervisor.
(See Kelley Dep. at 8.)

The Industrial Relations Supervisor reports directly to the Mine Manager.  (See id.)

Plaintiff complained numerous times to his supervisors regarding problems with Thornton.  He reported these problems to Tommy Rutland, Ronnie Hill and to the local union president. (See Lofton Dep. at 53-57, 93-96, 99-100.)  Specifically, Lofton stated that he told Ronnie Hill that Thornton resented receiving work instructions from Lofton, that Thornton was not dependable and that Lofton and other employees ended up doing Thornton's work because he either refused to do it or did it inadequately. (See id. at 93-95.)  Plaintiff also told Hill that he planned to bid for another position so as not to work with Thornton.  (See id. 95-96.)

Three weeks prior to the incident at issue, Ronnie Hill convened a meeting to discuss Lofton's complaints.[8]  (See id. at 96-97.)  Lofton, Thornton, Hill, the local union president and other members of management attended the meeting.  (See id.)  At the end of the meeting Hill instructed Thornton to carry out Lofton's work orders.  (See id.)  Hill then became angry at Thornton when he stated he resented doing what plaintiff told him

_____

[8] Hill asserts, however, that he called the meeting to address concerns about Lofton's treatment of Thornton.  (See Hill Aff. ¶ 7.)  He stated that he "heard from several employees that Mr. Lofton was bothering Mr. Thornton and was making the work environment difficult for Mr. Thornton.  I called this meeting in hopes of solving the problem so that I Would not have to discharge either of them."  (See id.)

7

to do  (See id. at 97.)  Hill closed the meeting and told
plaintiff to report any further problems to Tommy Rutland.  (See
id. at 98.)

Sometime later plaintiff complained to Rutland about
Thornton.  He reported that Thornton resented receiving work
instructions from Lofton and requested that Rutland give Thornton
his work instructions directly.  (See id. at 99-101.)  Rutland
responded that he would work with them as often as he could.
(See id. at 103.)  Plaintiff also stated that he reported
problems with Thornton to another supervisor named Hollywood.[9]

Before Thornton was placed into the position of machine
operator, Lofton told Ronnie Hill that he believed Thornton was
an unsafe driver and should not be placed in this position
because he had not been task trained.  (See id. at 87-88.)
Despite this poor recommendation, defendant placed Thornton in
this position; from that moment forward Thornton "had an
attitude" with plaintiff and told him that he did not appreciate
Lofton reporting that he was not qualified to person the machine
operator job.  (See id. at 89.)

Plaintiff testified that he had to confront Thornton on a
daily basis, discipline him when he was late for work and

_____

[9]  It is undisputed that plaintiff never filed a grievance
against Thornton nor did he ever report Thornton to Rayford
Kelley, the Industrial Relations Supervisor.  (See Lofton Dep. at
102, 169, 170.)

continuously give him work assignments.[10]   (See id. at 86, 99,
104.)  Plaintiff believes that management did not discipline
Thornton often enough.  (See id. at 104.)

### Incident with Clive Thornton

On March 12, 2000 Lofton called Rutland and asked him to
report to the work area to give Thornton his work instructions.
(See Lofton Dep. at 106.)  Rutland complied with plaintiff's
request and actually worked with the crew for some period.  (See
id. at 106-07.)  The crew began dusting in the mine with Thornton
as the operator.  (See id. at 107.)  An enormous amount of
pressure began to build so that plaintiff could barely hold the
hose.  (See id.)  He asked Rutland to turn down the pressure; he
tried to get the pressure under control, but it did not make the
hose as smooth as it should have been.  (See id.)  After helping
plaintiff, Rutland left the crew to work without him.  (See id.
at 108.)

Approximately an hour later the crew finished working in
that area and moved to another.  (See id. at 111.)  The crew then
experienced a problem with the pressure tanks.  (See id.)  Eddie
Torean[11] tried to fix the problem but failed and suggested that

_____

[10] Although plaintiff and Thornton were simply co-workers,
plaintiff seems to have informally played a role as a "lead
person."

[11] The court is unsure as to the correct spelling of Mr.
Torean's name.  Plaintiff's brief spells it either "Toeran" or
"Torean."  Defendant's brief spells it as "Toeran."  The

plaintiff attempt to fix it.  (See id. at 112.)  Plaintiff then
told Thornton "to put some air pressure in that tank because
otherwise it's going to plug up."  (See id. at 113.)  However,
when plaintiff arrived at the tank he saw it was already plugged
up so the entire crew had to work to clear it.  (See id.)  On the
way to clear out the tank, plaintiff broke a pipe in the middle
to see how far the plug went and quickly noticed that the hose
was about to burst.  (See id.)  Although the entire crew was
working on fixing the problem, Thornton was "just standing
there."  (Id.)

     After straightening the hose, plaintiff told Thornton
"You've got to be smarter than the hose as long as you've been
blowing these tanks now, you should realize what you need to do."
(Id. at 114, Ex. 6.)  Plaintiff and others then began to fix the
line; they cut the hose where it burst and placed a wire inside
to strengthen it.  (See id. at 115.)  Although Thornton should
have had his side cutters, he did not so plaintiff had to cut the
line.  (See id.)  Thornton complained that plaintiff almost cut
him; plaintiff responded that Thornton was a "cry baby" and that
no one had tried to cut him.  (See id.)

     The crew continued to work for some time but the problems

transcript of plaintiff's deposition spells it as "Toeran" as
well, but the transcript of Rayford Kelley's deposition spells it
as "Torean."  The exhibits attached to plaintiff's and Kelley's
depositions spell it as "Torean."  The court will spell his last
name as Torean.

between plaintiff and Thornton soon resumed.  At some point
plaintiff called Thornton an "ass."  (See id. at 146, Ex. 6.)
Thornton asked plaintiff not to curse him and Lofton replied that
"ass" was not a curse work because "everyone has an ass."  (See
id.)  Thornton responded by telling plaintiff "You better get out
of here" and told him to "get out of here before I kill you."
(See id. at 116, 146, Ex. 6)  Plaintiff responded that he would
go where he wanted to go.  (See id.)  At this point plaintiff
walked back toward to locomotive to find his jacket but turned to
see Thornton standing near him or right behind him.  (See id. at
117.)  When plaintiff looked back, he realized that Thornton had
a ratchet in his hand.  (See id. at 147, Ex. 6.) Thornton stated
"you wont [sic] to hit me don't you."  (See id. Ex. 6.)
Plaintiff responded by saying "You better get out of my face" and
turned to walk away.  (See id. at 147-48.)  Then Thornton hit
plaintiff in the back of the head twice with the ratchet cutting
plaintiff and causing him to bleed.  (See id. at 118-19, 147-48,
Ex. 6.)  Plaintiff denies hitting Thornton, but Thornton
maintains that plaintiff hit him first.  (See id. at 118; Kelley
Dep. at 24-25; Hill Aff. ¶ 3.)

     Two co-workers, Dwight Ford and Eddie Torean, pulled
Thornton off plaintiff.  (See Lofton Dep. at 119.)  Someone made
the statement that "they're going to fire somebody."  (See id. at
120.)  Plaintiff told them not to worry because he would tell the

company that he had fallen down because he wanted to keep Thornton from losing his job.  (See id.)

    After the altercation, plaintiff met with Tommy Rutland and told him that he tripped and fell over four-inch pipe and that he cut himself when his head struck the rock dust tank.  (See id. at 127, 129-30, Ex. 3.)  He identified Thornton and Eddie Torean as witnesses.  (See id. at 128, 134.)  Plaintiff's report of his injury was one that would qualify for workers compensation[12] so once the authorization for medical treatment was completed, he was treated on-site and then taken to the emergency room.[13]  (See id. at 125, 128, 130.)  The next day plaintiff met with Brenda Allbritton of defendant's Safety Department.  (See id. at 131.)  She gave him an authorization for further treatment.  (See id.)  He went for a re-check the next day and was diagnosed with mild post-concussion syndrome.[14]  (See id. at 134.)

_____

    [12] If employees are injured in altercations in which they do not participate and are not at fault, the injury is covered by worker's compensation.  (See Kelley Dep. at 45.)

    [13] In light of plaintiff's story, defendant paid him for the full shift even though he did not work the rest of the day.  (See Kelley Dep. at 33.)  Defendant does not typically pay employees who leave work early because of illness or other non-work related injuries.  (See id. at 32-34.)

    [14] Because of the representation that this was a workers compensation injury, the hospital did not require plaintiff to pay his co-pay for his treatment or for his medication.  (See Lofton Dep. at 133-35.)  Defendant maintains that it paid for these services.  (See Kelley Dep. at 33.)  However, plaintiff stated that he had to file his injury under his regular hospital coverage after he was terminated.  (See Lofton Dep. at 153.)

12

On Monday, March 13, 2000, Ronnie Hill learned from one of plaintiff's co-workers that plaintiff lied about the cause of his injury. (<u>See</u> Hill Aff. ¶ 2; Kelley Dep. at 15.) The co-worker told Hill that the plaintiff was going to call him. (<u>See</u> Hill Aff. ¶ 2.) Hill then told Kelley "that the initially reported accident may not have been accident, it may have been an altercation instead." (<u>See</u> Kelley Dep. at 15.) The next day, March 14, 2000, plaintiff called Hill and asked him if he could come out to the mine and talk.[15] (<u>See</u> Lofton Dep. at 135-37; Kelley Dep. at 15.)

Plaintiff met with Kelley, Hill and Ken Russell, the safety supervisor. (<u>See</u> Lofton Dep. at 136, 139-40.) He told them that he lied when first reporting his injury and that he had actually been attacked by Thornton. (<u>See</u> <u>id.</u> at 139-40; Hill Aff. ¶ 2.) Kelley, Hill and Russell told plaintiff that they would get back with him after investigating the incident and talking with Thornton. (<u>See</u> Lofton Dep. at 139-40; Kelley Dep. at 23-24.)

The next day Kelley and Hill met with Thornton and he reported that he did have words with plaintiff but that plaintiff hit him first with the rock dust hose. (<u>See</u> Kelley Dep. at 23-

_____

[15] Plaintiff stated that he started having second thoughts about lying. (<u>See</u> Lofton Dep. at 135-37.) He stated that he felt bad about lying to defendant and he had heard from people that Thornton made statements prior to the incident that he wanted to kill him. (<u>See</u> <u>id.</u> at 139.) He also consulted with his wife about the incident and decided to call a meeting. (<u>See</u> <u>id.</u>)

25; Hill Aff. ¶ 3.)   Thornton showed Kelley and Hill a cut at the
bottom of his eye which he claimed plaintiff caused.[16]   (See
Kelley Dep. at 24.)   He confirmed that he chased plaintiff and
hit him with a ratchet.   (See id. at 25.)   After the admission
that he hit plaintiff Hill and Kelley suspended Thornton for five
days with intent to discharge.   (See id. at 25; Hill Aff. ¶ 3.)
Kelley and Hill also talked to Eddie Torean and Dwight Ford.
Neither admitted witnessing the altercation and instead stated
they arrived at the end.   (See Kelley Dep. at 25; Hill Aff. ¶ 4.)
One did report helping plaintiff off the ground.   (See Kelley
Dep. at 25.)

    After meeting with Thornton, Torean and Ford, Kelly called
plaintiff at home and informed him of Thornton's allegation that
plaintiff attacked him first.   (See Lofton Dep. at 140-41; Kelley
Dep. at 25-26.)   He then told plaintiff of the decision to
suspend him for five days with intent to discharge.   (See Lofton
Dep. at 141; Kelley Dep. at 25-26.)   This decision was made after
the investigation; the false worker's compensation claim filed by
plaintiff was also factored into this decision.[17]   (See Kelley

──────────────

        [16] Plaintiff denies hitting Thornton but does not dispute
that Thornton accused plaintiff of attacking him.   (See Lofton
Dep. at 81, 118.)

        [17] Kelley stated that plaintiff was not entitled to worker's
compensation benefits because he sustained injuries in a fight in
which he participated.   (See Kelley Dep. at 53.)   Worker's
compensation would have covered his injuries if he had not
participated in the fight.   (See id. at 46.)

Dep. at 32, 34-35; Hill Aff. ¶ 5.)

Pursuant to the terms of the collective bargaining agreement, the defendant met separately with plaintiff and Thornton for the required 24/48 Hour Meeting. (See Lofton Dep. at 142; Kelley Dep. at 27-28.) At plaintiff's meeting, plaintiff, a union representative, Kelley, Hill and Fred Kozel, the Mine Manager,[18] were present. (See Lofton Dep. at 142, Kelley Dep. at 28-29.) Plaintiff told his version of the story and then given the choice to resign or be fired.[19] (See Lofton Dep. at 142.) He stated that when he denied hitting Thornton, Kozel told him that regardless of whether he hit Thornton, he still lied on his worker's compensation claim. (See id. at 152-53.) Kozel also informed plaintiff that if he was fired and went through arbitration, they would tell any potential employer that he was terminated for fighting and falsifying documents. (See id. at 142.) Plaintiff decided to resign in lieu of termination and did so two days after the meeting.[20] (See id. at 143.)

_____

[18] The mine manager makes the final determination as to whether a person will or will not be terminated. (See Kelley Dep. at 14.)

[19] Kelley testified that in the meeting he outlined the facts, including the fight and the false worker's compensation claim. (See Kelley Dep. at 28-29.) When the union representative tried to focus solely on the fight, Hill responded that regardless of the fighting the false worker's compensation claim was a dischargeable offense. (See id. at 29.)

[20] At Thornton's meeting defendant also gave him the option of resigning. (See Kelley Dep. at 29-30.) He refused and,

15

## Previous Discrimination Lawsuit

In 1998 the plaintiff and three other people[21] sued Jim Walters for race discrimination and racial harassment.  (See Kelley Aff. ¶ 10.)  This lawsuit settled in April 1999.  (See id.)  As a part of the settlement the plaintiff agreed that if he experienced a racially hostile environment again he would "file a grievance and/or report the conduct to the Industrial Relations Supervisor and/or the Mine Manager, within a reasonable time period to allow JWR to fully investigate the allegations."  (Id.) At his deposition Lofton stated that although the racially-hostile environment "never really changed" after the settlement, he "ignored it because I just made the best of it."[22]  (Lofton Dep. at 52, 58.)

## IV. Applicable Substantive Law and Analysis

Plaintiff claims disparate treatment racial discrimination and retaliation under 42 U.S.C. § 1981.  Section 1981 provides that:

> All persons within the jurisdiction of the United
> States shall have the same right in every State and

---

accordingly, defendant discharged him.  (See id.)  Thornton filed a grievance challenging his discharge and the arbitrator upheld the decision.  (See id.)

[21] Michael Foster, Carl Hill and Ronnie Hill were also plaintiffs in the 1998 discrimination suit.  (See Kelley Aff. ¶ 10.)

[22] Plaintiff is not claiming racial harassment.  (See Lofton Dep. at 49-50, 58-59.)

16

Territory to make and enforce contracts, to sue, be
parties, give evidence, and to the full and equal
benefit of all laws and proceedings for the security of
persons and property as is enjoyed by white citizens,
and shall be subject to like punishment, pains,
penalties, taxes, licenses, and exactions of every
kind, and to no other.

42 U.S.C. § 1981(a) (1994).  The court is aware that the summary

judgment rule applies in job discrimination cases just as in

other cases.  See Chapman, 229 F.3d at 1025 (rejecting an

earlier, contrary general rule and emphasizing that no thumb is

to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined

not only by the nature of the allegations but also by the quality

of the evidence offered in support of those claims.  See

Standard, 161 F.3d at 1330 (noting that "[t]he analytical

framework and burden of production var[y] depending on the method

of proof chosen").  In general, a plaintiff may attempt to

establish a claim of illegal employment discrimination through

the use of direct evidence, circumstantial (indirect) evidence,

or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d

1257, 1266 (11th Cir. 1999) (recognizing the availability of

either direct or circumstantial evidence).  A plaintiff's ability

to proceed through the use of circumstantial evidence of

discrimination is necessarily important because direct proof of

discrimination is uncommon.  See Combs v. Plantation Patterns,

106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals

17

Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is
"[s]uch evidence [which], if believed, proves the existence of a
fact in issue without inference or presumption." Burns v.
Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).
Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir.
1999) (per Tjoflat, J.) (defining direct evidence as "evidence
from which a reasonable trier of fact could find, more probably
than not, a causal link between an adverse employment action and
a protected personal characteristic" and finding the outcomes
reflected in prior case law consistent with that definition); see
also Bass v. Board of County Commissioners, Orange County,
Florida, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning
of "direct evidence" in the context of a Title VII race
discrimination claim; "direct evidence" refers to a type of
evidence which, if true, would require no inferential leap in
order for a court to find discrimination."). "Direct evidence is
composed of only the most blatant remarks, whose intent could be
nothing other than to discriminate on the basis of some
impermissible factor." Rojas v. Florida, 285 F.3d 1339, 1342,
n.2 (11th Cir. 2001)(quoting Schoenfeld v. Babbitt, 168 F. 3d
1257, 1266 (11th Cir. 1999))(citations and quotations omitted).
However, direct evidence does not include "stray remarks in the
workplace" or "statements by nondecisionmakers" or "statements by
decisionmakers unrelated to the decisional process itself."

18

Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (O'Connor, J., concurring) (1989);  see also EEOC v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir. 1990) (quoting Price Waterhouse).

Here, plaintiff has presented only circumstantial evidence of racial discrimination and retaliation.  "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527.  Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was

19

subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[23]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[24]  See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury

---

[23] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

[24] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

20

to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[25]  Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25. Where plaintiff seeks to prove pretext by showing she was more qualified than the person given the job or promotion, she "must adduce evidence that the disparity in qualifications is 'so apparent as virtually to jump off the page and slap you in the face.'" Cofield v. Goldkist, Inc., 267 F3d 1264, 1268 (11th Cir. 2001) (quoting Deines v. Texas Dept. of Protective and Reg. Sevs., 164 F.3d 277, 280 (5th Cir. 1999)).   Therefore, the relevant inquiry "is not to judge which employee was more qualified, but to determine whether any disparity . . . is so great that a reasonable fact-finder could infer that [defendant] did not believe" that the person granted the promotion was better qualified.  Cofield, 267 F.3d at 1268. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

---

[25] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

Despite this shifting of the burden of production between the plaintiff and the defendant under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Burdine</u>, 450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion);[26] <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502

---

[26] The court in <u>Chapman</u> modified the statement in <u>Combs</u> contrary to this holding in <u>Reeves</u> after noting that the standard for granting summary judgment mirrors the standard for judgment

(1993); <u>Abel v. Dubberly</u>, 210 F.3d 1334, 1339 (11th Cir. 2000);
<u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1336 (11th Cir. 2000);
<u>Combs</u>, 106 F.3d at 1529-38 (interpreting <u>Hicks</u> and the post-<u>Hicks</u>
case law); <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913,
920-21 (11th Cir. 1993).

Defendant argues that it is entitled to summary judgment as
to plaintiff's race discrimination claims because (1) plaintiff
has failed to establish a prima facie case of disparate
treatment; (2) even if plaintiff has established a prima facie
case of disparate treatment he has not rebutted defendant's
legitimate, nondiscriminatory reason for its action; and (3)
plaintiff has failed to establish a prima facie case of
retaliation.

### A.  Disparate Treatment

Plaintiff claims disparate treatment based on his
termination.  To establish a prima facie case of racial
discrimination a plaintiff must show that: "(1) he belongs to a
racial minority; (2) he was subjected to adverse job action; (3)
his employer treated similarly situated employees outside his
classification more favorably; and (4) he was qualified to do the
job." <u>Holifield</u>, 115 F.3d at 1562; <u>see also</u> <u>Crapp v. City of
Miami Beach</u>, 242 F.3d 1017, 1020 (11th Cir. 2001).  It is
undisputed that plaintiff is a member of a racial minority,

─────────────────

as a matter of law.  <u>See</u> <u>Chapman</u>, 229 F.3d at 1025, n.11.

23

suffered an adverse employment action and is qualified to do the job.

As to the third element of plaintiff's prima facie case, the plaintiff must show a comparator who is "similarly situated in all relevant aspects." Silvera v. Orange County School Board, 244 F.3d 1253, 1259 (11th Cir. 2001). For example, in the disciplinary context, "the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" Id. (citing Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis added). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Holifield, 115 F.3d at 1562.

Plaintiff presents Roger Potter, a white employee, as his comparator. Plaintiff contends that Potter was treated more favorably for similar conduct, thus satisfying the third element of his prima facie case. (See Pl.'s Brief at 18.) He argues that Potter was involved in an altercation with another employee, Bill Foster.[27] Potter claimed that Foster attacked him; however, Foster denied hitting Potter. (See Lofton Dep. at 70.) Subsequently Foster confirmed Potter's account of the incident

---

[27] This altercation occurred some time after Lofton resigned from Jim Walters. (See Kelley Dep. at 39.)

and admitted to the plaintiff that he was the aggressor.  (<u>See</u> <u>id.</u> at 70-71.)  Another employee informed Rayford Kelley about the altercation, and Potter later told Kelley that Foster attacked him.  (<u>See</u> Kelley Dep. at 38-39.)  Potter told Kelley that the incident began when Foster expressed disapproval with the union's decision to change health insurance carriers.[28]  (<u>See</u> <u>id.</u> at 40.)  When Potter turned to walk away from this conversation Foster grabbed him and shoved him into one of the rib walls.  (<u>See</u> <u>id.</u>)  Potter stated that Foster released him only after he made several pleas.  (<u>See</u> <u>id.</u>)

Kelley further investigated Potter's allegations.  (<u>See</u> <u>id.</u> at 41.)  Although most denied having any first hand information, one employee did confirm Potter's account and described Foster as the aggressor.  (<u>See</u> <u>id.</u>)  Because Potter sustained injuries as a result of an attack by a co-worker and was not at fault in any way, defendant treated his injuries as compensable under worker's compensation.  (<u>See</u> <u>id.</u> at 45.)

Based upon Potter's complaint and the eye-witness confirmation, defendant suspended Foster for five days with the intent to discharge on November 30, 2001.  (<u>See</u> <u>id.</u> at 41.)  On December 4, 2001 Jim Walters, Foster and a union representative

---

[28] At the time of this incident, Potter was the vice president of the UMWA Local No. 2245.  (<u>See</u> Kelley Dep. at 38.) Foster believed Potter was one of the people responsible for this change.  (<u>See</u> <u>id.</u> at 40.)

met for the 24-48 Hour Meeting.  (See id. at 42.)  At this meeting, however, Potter changed his story and stated that the argument occurred but he could not remember when Foster attacked him.  (See id. at 42-43.)  He maintained this story even when Kelley showed Potter the accident report and medical treatment forms.  (See id.)  Kelley called a break in the meeting and requested a conference with the union representative.  (See id. at 43.)  He told the union representative that he knew they were just trying to save Foster's job by changing the story.  (See id.)  He further stated that if the union representative insisted on taking such a position he was "prepared to issue Mr. Potter five days with intent [to discharge]."  (Id.)  The union representative then met with Potter who subsequently stated "I'm sorry, I did tell you a lie, it happened just like I told you earlier.  Mr. Foster grabbed me and slung me into the rib [wall], I did go for medical treatment, I did tell the doctor what happened."  (Id. at 43.)  After Potter admitted he lied to Kelley, Foster's 24/48 meeting resumed and Foster resigned effective January 2, 2002.[29]

---

[29] Once Foster's 24/48 meeting resumed the union representative asked for "something short of discharging Mr. Foster."  (Id. at 44.)  Kelley stated that Jim Walters would not allow him to work at the mine and he would either terminate Foster or he could resign.  (See id.)  Foster replied that he did not want to resign yet but he also did not want to challenge the decision in arbitration.  (See id.)  He continued by stating that he intended on retiring the following year and asked if he could be suspended until the first of the year for retirement purposes.

Plaintiff maintains that Lofton and Potter are similarly situated employees for the purpose of establishing a prima facie case of race discrimination.[30]   The court disagrees.   Although both men were involved in an altercation at the mine and reported their injury as a worker's compensation injury, the details surrounding both incidents are drastically different.   Potter did not participate in the fight with Foster; however, according to Thornton and as told to Hill and Kelley, plaintiff hit him first and was involved in the altercation.[31]   (See Lofton Dep. at 81;

---

(See id.) After some discussion, Kelley and the Mine Manager granted Foster's request and suspended him until January 1, 2002 with his resignation effective January 2, 2002.   (See Kelley Dep. Ex. 8.)

[30] Plaintiff, at the end of his brief, throws out the argument that he and Foster are similarly situated employees. They are not.   It is unrefuted that Foster attacked Potter.   (See Lofton Dep. at 70-71; Kelley Dep. at 41.)   The plaintiff maintains that he did not hit Thornton.   Additionally, Foster did not make a claim for worker's compensation.   Although the court understands that the plaintiff does not think it is fair that Foster was allowed to resign a month later and got his "days" under the collective bargaining agreement for the next year, that fact does not establish race discrimination.

[31] Plaintiff relies on one statement made by Kelley in his deposition in arguing that defendant did not think that plaintiff was involved in the fight.   (See Kelley Dep. at 45.)   However, this statement is inconsistent with the rest of Kelley's deposition.   When relaying the story of the incident, Kelley stated that Thornton told the defendant that plaintiff started the fight.   (See id. at 16.)   Additionally, later in his deposition, when asked whether he believed plaintiff's injury should have been covered by worker's compensation Kelley unequivocally stated "I do not" because "Mr. Lofton was involved in an altercation in which he was guilty and participated in as well as Mr. Thornton."   (Id. at 53.)   Therefore, the court does not find Kelley's earlier inconsistent statement, relied on by

Kelley Dep. at 16, 53.)  Additionally, Potter did not falsify a
worker's compensation claim.  Potter did later change his story
to protect Foster[32] in his 24/48 Hour Meeting but after
discussing the repercussions of this action he admitted to lying
and recounted his previous report of the incident.  (See Kelley
Dep. at 40-43.)  Plaintiff, however, lied about the fight and
received worker's compensation benefits as a result.[33]  (See
Lofton Dep. at 128, 133-35; Kelley Dep. at 32-34.)  The fact that
plaintiff came forward with the truth later does not make him
more like Potter; plaintiff still falsified a claim where Potter
did not.  The court does not think that Potter's misconduct is
"nearly identical to the plaintiff's" thus preventing the court
"from second-guessing [the] employer's reasonable decision and
confusing apples with oranges."  Silvera, 244 F.3d at 1259.  In
short, plaintiff has failed to show the existence of a similarly
situated employee and, therefore, he has not established a prima
facie case.  As such summary judgment is due to be granted as to
this claim.  See Holifield, 115 F.3d at 1562.

_____

the plaintiff, to be as accurate a depiction of his testimony.

[32] As vice president of the local union chapter, Potter was
under pressure to protect Foster, a union member.  (See Kelley
Dep. at 46.)

[33] Defendant paid him for the rest of his shift, paid for
his hospital visits and for some medication.  (See Lofton Dep. at
133-35; Kelley Dep. at 32-34.)  Plaintiff has had to pay some
bills after his resignation, however.  (See Lofton Dep. at 133-
34.)

However, even assuming that plaintiff has established his
prima facie case, plaintiff has failed to rebut as pretext
defendant's legitimate and nondiscriminatory reasons for the
employment decision at issue, namely the fight and plaintiff's
filing of a false workers' compensation claim.  See Chapman, 229
F.3d at 1024-25.  Plaintiff relies solely on Kelley's
inconsistent statement[34] during his deposition that at the time
of plaintiff's termination defendant did not believe plaintiff
was involved in the altercation.  However, as explained in
footnote 30, this statement is not consistent with the rest of
Kelley's testimony and looking as a whole at Kelley's deposition,
the court finds that defendant did believe that plaintiff was
involved in the altercation.  (See Kelley Dep. at 16, 53.)  Thus,
the plaintiff has failed to show any evidence of pretext that
fighting and the filing of a false worker's compensation claim
were the reasons for his termination.  Nor has plaintiff
otherwise proved that intentional discrimination did indeed
motivate the defendant.  For this additional reason, defendant is
entitled to summary judgment in its favor on plaintiff's
disparate treatment claim.

---

[34] Plaintiff also argues that the different treatment of
Potter and Foster also shows pretext.  As discussed earlier,
neither Potter nor Foster were similarly situated employees.

29

## B.   Retaliation

Plaintiff claims that defendant retaliated against him for complaining of race discrimination by terminating him.   Defendant argues plaintiff has failed to establish a prima facie case of retaliation, and, in the alternative, plaintiff has failed to rebut defendant's legitimate, nondiscriminatory reason for his termination.[35]   The court finds that plaintiff has failed to

_____

[35] Plaintiff correctly points out to the court that the defendant did not argue the retaliation claim in its brief.   He also correctly states that under Coates v. Coates & Clark, the moving party has the "initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial," and "[o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."   929 F.2d 604, 608 (11th Cir. 1991).   As such, plaintiff does not address defendant's motion as to the retaliation claim in its brief.
Defendant did, however, state in its motion for summary judgment that "[a]s a matter of law, Lofton cannot establish a retaliation claim.   Lofton cannot establish a prima facie case of retaliation and/or cannot overcome JWR's legitimate, non-retaliatory reasons for the conduct at issue."   (Def.'s Motion for Summ. Judgment ¶ 2.)   Plaintiff implicitly urges this court not to address the retaliation claim because he was not given "a meaningful opportunity to rebut all grounds and all evidence advanced in support" of defendant's motion on the retaliation claim.   As for the prima facie case argument, the court believes that the plaintiff could have responded to defendant's claim that plaintiff could not establish a prima facie case, especially anticipating a causal link problem considering the huge gap in time between the prior discrimination suit and plaintiff's eventual termination.   As to defendant's alternative ground that plaintiff cannot overcome defendant's non-retaliatory reason for the challenged employment decision, plaintiff did not have to anticipate or guess defendant's argument.   A major thrust of defendant's brief is devoted to demonstrating that plaintiff's fight and false worker's compensation claim were the articulated reasons for the decision.   Plaintiff had ample opportunity to

30

establish a prima facie case of retaliation.

Generally, to establish a prima facie case of retaliation a plaintiff must show:  (1) that he engaged in protected activity; (2) that his employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) there was a causal link between his protected activity and the adverse employment action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).  The burden-shifting framework outlined above for discrimination claims also applies to retaliation claims.

The plaintiff can show the first three elements of his prima facie case; however, he has failed to link the adverse action with his protected activity.  "To establish a causal connection, a plaintiff must show that 'the decision-maker[s] [were] aware of the protected conduct' and 'that the protected activity and the adverse action were not wholly unrelated.'" Gupta, 212 F.3d at 590 (quoting Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1377 (11th Cir. 1999).  The causal link element is generally construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).  Thus, a "close temporal proximity"

---

address pretext under his disparate treatment claim as well as his retaliation claim.

between the plaintiff's protected conduct and an adverse
employment action generally is sufficient circumstantial evidence
of a causal connection for purposes of a prima facie case.  See
id.  On the other hand, the Eleventh Circuit has indicated that a
substantial delay between the protected activity and the adverse
employment action and the absence of other evidence tending to
show causation may justify judgment as a matter of law for the
employer.  See Wascura v. City of South Miami, 257 F.3d 1238,
1248 (11th Cir. 2001); Maniccia v. Brown, 171 F.3d 1364, 1370
(11th Cir. 1999).  Moreover, the Supreme Court stated that "mere
temporal proximity between an employer's knowledge of protected
activity and an adverse employment action . . . must be 'very
close.'" Clark County School Dist. v. Breeden, 532 U.S. 268, 273
(2001)(citations omitted).  In Breeden the Supreme Court found a
twenty month disparity was insufficient to show causal
connection.  See id. at 273-74.  The Court also cited with
approval cases holding that a three to four month disparity was
also insufficient.  See id. (citing Richmond v. ONEOK, 120 F.3d
205, 209 (10th Cir. 1997)(3-month period insufficient) and Hughes
v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992)(4-month
period insufficient).

Plaintiff's protected activity, the filing of his original
lawsuit, occurred in 1998 and settled in April 1999.  He resigned
in March 2000.  Therefore between plaintiff's first complaint and

32

the adverse employment action two years passed; over eleven months passed between the settlement and his resignation.  The court is unwilling to assume that a two year period or an eleven month period are sufficient to establish a prima facie case of retaliation.  See Clark County School Dist., 532 U.S. at 273-74 (stating that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close'" and citing approval cases holding three and four month disparities as insufficient).  As such, plaintiff has not established a prima facie case of retaliation. Summary judgment is therefore appropriate as to plaintiff's retaliation claim.

Even assuming that plaintiff has established a prima facie case of retaliation, plaintiff has failed to rebut as pretext defendant's legitimate and non-discriminatory reason for the employment decision, namely the fight and plaintiff's filing of the false worker's compensation claim.  See Chapman, 229 F.3d at 1024-25.  Plaintiff has offered no evidence other than that produced as to his disparate treatment claims; the court has earlier determined such evidence to be insufficient.  That same evidence serves plaintiff here no better than it served him as to those claims.  For this additional reason, defendant is entitled to summary judgment in its favor on plaintiff's retaliation claim.

33

In short, in order to prevail on defendant's summary judgement motion, plaintiff must come forward with evidence sufficient for a reasonable jury to conclude that the challenged conduct or decisions were indeed motivated by intentional discrimination or that defendant's proffered legitimate reasons were merely a pretext for illegal discrimination.  Plaintiff has not carried either burden of production.  The court finds that no material issues of fact remain and that defendant Jim Walter Resources, Inc. is entitled to judgment as a matter of law as to all claims asserted by plaintiff.  A separate order will be entered.

DONE this 25th day of June, 2003.

_____
SENIOR UNITED STATES DISTRICT JUDGE